

United States Courts
Southern District of Texas
FILED

JUL 10 2018

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. 18 CR 383 |
| | § | |
| | § | |
| JOHN ANDREW ELSNER | § | |
| LARRY ALLEN PAGE | § | |

**INDICTMENT**

**COUNT ONE**
**(Conspiracy- Title 18 U.S.C. §1349)**

At all times material to this Indictment:

A. <u>THE CORPORATE ENTITIES</u>

1. Logistical Solutions International, Inc., "LSI", was a C-Corporation registered in the State of Texas. LSI was a parent company to three other corporate entities, Eagle Eye Oil Services Ltd., LSI Jordan, and Logistical SI Limited. LSI was headquartered in Houston, Texas. Eagle Eye Oil Services Ltd. was registered in Iraq and was used by LSI for contracts for in-country services. LSI Jordan was located in Amman, Jordan and was primarily utilized for the recruitment of dual-language personnel for Iraq related projects. Logistical SI Limited was registered in the United Kingdom. Several of LSI's Middle East management team moved from

1

Houston, Texas to Oxford, England in October 2014 to establish an office under Logistical SI Limited.

2. The business of LSI was to provide corporations with logistical support and training services that facilitated the stay of international visitors on assignment to train, attend meetings and work outside their home country either on a short or long-term basis. A large portion of LSI's business came from the oil and gas industry. LSI's largest market was Iraq. LSI had large service contracts for two large corporations doing business in Iraq, hereinafter, "Company A" and "Company B".

B. DEFENDANTS

1. John Andrew ELSNER ran the day-to-day activities of LSI in various capacities, including as the President, Senior Vice President and General Manager. ELSNER also sat on the Board of Directors as one of the majority shareholders. In October 2014, ELSNER moved his office from LSI's headquarters in Houston, Texas to Oxford, England. This move was in conjunction with the move of several other of LSI's Houston employees to Oxford, each of whom were part of the LSI Middle East team.

2. Larry Allen PAGE, was employed at LSI as Vice President of Finance. As the Vice President of Finance, PAGE oversaw all aspects of LSI's financing, including interfacing with investors, lenders and financial institutions.

PAGE was also Vice President of Accounting for a period-of-time at LSI, and subsequently continued to interact daily with the accounting department in carrying out his responsibilities as Vice President of Finance.

### C. FACTORING AGREEMENTS

1. Factoring companies purchase, at a discount, commercial accounts receivable from businesses with whom the factoring company has formed a contractual relationship. The business' accounts receivable are based, or are alleged to have been based, on the business having performed services or sold goods to their customer. The performance of the service or sale of goods is evidenced by invoices.

2. The discount percentage of the accounts receivable purchased by the factoring company is determined by the risk assumed by the factoring company. The risk to the factoring company relates, in part, to the ability of the factoring company to later collect on the receivable. Businesses typically sell their accounts receivables to factoring companies based on cash flow needs.

3. Factoring companies may also enter into other financing arrangements which assist with a business' cash flow needs, such as providing loans, advancing funds and financing specific business transactions.

4. Spinnaker Financial, Inc. ("Spinnaker") was a Texas corporation with its principal place of business in Fort Bend County, Texas, within the Southern District of Texas. Spinnaker was an invoice factoring company who specialized in

providing working capital to small companies who were not eligible to receive financing from a bank or other commercial lender.

5. LSI began factoring invoices with Spinnaker in 2002. LSI and Spinnaker signed a Master Factoring Agreement on or about August 1, 2002. Through this agreement, LSI sought to sell its accounts receivable to Spinnaker at a discount. Spinnaker typically purchased an LSI invoice for 85% of the face value of that invoice. LSI emailed their requests to Spinnaker to factor or purchase LSI accounts receivable, via an Account Purchase Agreement. The Account Purchase Agreement represented to Spinnaker that the invoice(s) reflected in that request were actual invoices for work performed by LSI and the amount shown on each invoice was in fact due and owing to LSI. Upon receipt of this documentation, Spinnaker wire transferred the funds for the purchase of the invoice(s) to LSI's bank account.

6. It was LSI's responsibility to issue the invoice to their client and collect 100% of the invoice amount. Once LSI's client paid an outstanding invoice, the funds were deposited into a bank account controlled by Spinnaker. Spinnaker was entitled to receive the full amount Spinnaker paid to LSI for the invoice (the discounted price). The remaining 15% from the client's payment of the invoice was split between LSI and Spinnaker, based generally on the amount of time the invoice remained outstanding. LSI was required to re-purchase invoices from Spinnaker which had not been fully paid within a set period of time.

7. In the Master Factoring Agreement, LSI warranted to Spinnaker that all invoices issued by LSI for factoring shall represent work actually completed, services rendered, or goods delivered pursuant to an appropriate purchase order and shall constitute a valid account receivable from LSI's customers. LSI further represented to Spinnaker that there were no off sets or claims against such invoices.

8. At the request of LSI in 2008, Spinnaker agreed to provide limited additional funding, to assist LSI with cash flow needs. Spinnaker agreed to advance funds for certain reimbursable expenses, not yet invoiced to LSI's client. The advances from Spinnaker were only available when specifically requested by LSI and identified as a request under this limited special funding. LSI used the term "pre-factoring", in their requests to Spinnaker for advance funds for the reimbursable expenses on a specific project. Additionally, Spinnaker set a hard limit of $500,000 for the total amount Spinnaker was willing to advance under this special funding.

C. INVESTORS

1. LSI sought loans and gifts from individuals and corporate entities. Representations were made by LSI and some of its top management, to these investors or potential investors regarding how these funds were to be expended on behalf of LSI. Further, representations were made by LSI and their principles, regarding the repayment of loans by LSI. Loans were made, and not repaid as promised.

2. LSI also sought equity investors and entities or individuals interested in purchasing LSI. In an effort to find willing buyers or investors, LSI hired a private firm operating in London, England to find and persuade potential investors and/or buyers to consider LSI as a viable or good investment. To support the search for investors/buyers, LSI provided their financials to the private firm. The financial information requested by the private firm included information regarding LSI's debt to Spinnaker from factoring. At no time did LSI inform the private firm, or any actual or potential investor that any of the debt to Spinnaker was generated from the sale of false invoices.

D. <u>THE CONSPIRACY</u>

From at least February 1, 2011 and continuing through June 15, 2015, in the Southern District of Texas and elsewhere, the defendants,

> JOHN ANDREW ELSNER
> LARRY ALLEN PAGE

did knowingly conspire and agree with each other to commit the following offense against the United States:

To knowingly devise and intend to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations, and promises, and to knowingly use and cause to be used interstate wire communications facilities in carrying out the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

E. <u>MANNER AND MEANS OF THE SCHEME AND ARTIFICE</u>

The manner and means of the scheme and artifice were as follows:

1. John Andrew ELSNER entered into a Master Factoring Agreement with Spinnaker in which LSI agreed to sell at a discount their accounts receivable generated from goods and services already performed under a valid contract with their clients.

2. Larry Allen PAGE and John Andrew ELSNER signed on behalf of LSI, Account Purchase Forms for the sale of specific accounts receivable to Spinnaker at a discount.

3. John Andrew ELSNER and Larry Allen PAGE caused to be generated a cash report to evaluate the cash needs of LSI.

4. John Andrew ELSNER and Larry Allen PAGE included and caused to be included on certain Account Purchase Forms, LSI invoices fraudulently created for the sole purpose of selling those invoices to Spinnaker, by falsely representing to Spinnaker that those invoices were "final" indicating the work described on the invoice had been performed by LSI and the face amount of the invoice was due and owed to LSI.

5. John Andrew ELSNER fraudulently caused the creation of LSI invoices which purported to be for services allegedly performed by LSI on behalf of Company A or Company B, when in fact those services had not been performed.

7

6. John Andrew ELSNER and Larry Allen PAGE held, and caused to be held, fraudulently created LSI invoices submitted to Spinnaker for factoring, rather than mailing the invoice to their client identified on the invoice, since the work listed on the invoice had not actually been performed as falsely represented to Spinnaker.

7. Larry Allen PAGE referred to the LSI invoices held and not mailed to their client, as "financing invoices". Financing invoices included LSI invoices fabricated and sold to Spinnaker as "final" invoices, although the services reflected on the invoice had not actually been performed, and therefore, the client could not be billed.

8. John Andrew ELSNER and Larry Allen PAGE submitted and caused to be submitted factoring requests and supporting documentation to Spinnaker through interstate wire communications via email.

9. John Andrew ELSNER and Larry Allen PAGE caused Spinnaker to wire transfer the fraudulently obtained factoring proceeds from Spinnaker's bank account to an LSI bank account.

10. Larry Allen PAGE caused the books and records of LSI to reflect the "financing invoices" as actual Accounts Receivable and actual Sales of LSI.

11. Larry Allen PAGE adjusted and caused to be adjusted the books and records of LSI at year-end, to remove as revenue the "financing invoices" still not

mailed to a client for payment, which were previously posted as actual Accounts Receivable and actual Sales.

12. John Andrew ELSNER and Larry Allen PAGE submitted, and caused to be submitted, to Spinnaker for factoring more "financing invoices" charging service fees than LSI could legitimately have billed to their client under the LSI contract with that client.

13. John Andrew ELSNER and Larry Allen PAGE covered up and hid the submission of "financing invoices" to Spinnaker for factoring, through subsequent invoicing to the client of an "A" invoice for services performed in another time period.

14. John Andrew ELSNER and Larry Allen PAGE caused LSI's debt to Spinnaker to grow beyond that which they could legitimately bill their clients through the submission of "A" invoices for services actually rendered by LSI.

15. John Andrew ELSNER and Larry Allen PAGE assured Spinnaker, and caused other LSI employees, to assure Spinnaker that LSI had made and was making all reasonable efforts to collect on the invoices which had been outstanding for over 90 days.

16. John Andrew ELSNER sought and received a loan of approximately $1,150,000 from an overseas business to pay down debt LSI owed to Spinnaker for aging accounts receivable. ELSNER did not disclose to the lender that any portion

of the debt owed to Spinnaker had been obtained by submitting to Spinnaker fraudulent invoices for factoring.

16. John Andrew ELSNER and Larry Allen PAGE met with and provided LSI financials to a private firm hired by LSI to find investors to capitalize LSI.

17. John Andrew ELSNER and Larry Allen PAGE omitted in their discussions with and submissions to the private firm that millions of the debt owed to Spinnaker was acquired through selling "financing invoices" to Spinnaker, and therefore that portion of the debt to Spinnaker was not collateralized by a valid invoice which would result in a payment from the invoiced client.

18. John Andrew ELSNER and Larry Allen PAGE caused Spinnaker to purchase over $4 million in "financing invoices" which were never submitted to a client, and the principle amount of the invoices were never repaid to Spinnaker.

F. ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of the conspiracy described in Count One, and to effect the objects thereof, the defendants named therein and other persons both known and unknown to the grand jury, performed or caused the performance of one or more of the following acts, among others not described herein, in the Southern District of Texas and elsewhere on or about the following dates:

(1) January 31, 2012, Larry Allen PAGE caused to be created two LSI Balance Sheets in an Excel Spreadsheet. One Balance Sheet was created under a tab

marked "Internal" and the other Balance Sheet was created under a tab marked "External". There were adjustments to the accounts receivable and income entries on the "Internal" Balance Sheet to account for fabricated invoices not mailed to the client.

(2) March 4, 2013, Larry Allen PAGE sent an email to LSI's Vice President for the Middle East asking whether specific invoices on LSI's books as "financing invoices" were "actual" sales since the invoices were not sent to the client for payment.

(3) March 5, 2013, LSI's Vice President for the Middle East sent an email response to Larry Allen PAGE confirming the invoices PAGE was inquiring about were not "actual" December sales.

(4) March 5, 2013, Larry Allen PAGE wrote a memo titled "Accrual of Revenue for 2012" in which he stated that "financing invoices" were removed from monthly revenue numbers.

(5) August 15, 2013, Larry Allen PAGE sent an email to LSI's tax accountant in response to the accountant's questions. PAGE's email explained the $1,023,900 adjustment to LSI's Accounts Receivable was due to a form of "unsecured borrowing" from the Factoring Company to bridge LSI's cash flow deficit through a process of creating a pro forma invoice for known future projects and then factoring these invoices. PAGE stated the pro forma invoices were recorded

as a debit to accounts receivable and a credit to sales. "In the closing process we make an entry to reverse this entry since we do not have either a true receivable or actual sales."

(6) April 28, 2014, John Andrew ELSNER caused to be emailed to Spinnaker a spreadsheet and invoices identifying the invoices LSI requested Spinnaker purchase at a discount, including invoice 5335, which purported to bill Company B $68,000 for work performed by LSI on project 38-209-0002.

(7) April 28, 2014, John Andrew ELSNER signed Account Purchase Form 8079 for Spinnaker to purchase from LSI an accounts receivable, that is, invoice 5335 for $57,800.

(8) June 3, 2014, Larry Allen PAGE sent an email to Spinnaker with an attached spreadsheet and the invoices LSI requested Spinnaker purchase at a discount, including invoice 5457, which purported to bill Company B $68,000 for work performed by LSI on project 38-209-0002.

(9) June 3, 2014, Larry Allen PAGE signed Account Purchase Form 9254 for Spinnaker to purchase from LSI an accounts receivable, that is, invoice 5457 for $57,800.

(10) August 12, 2014, Larry Allen PAGE caused an email to be sent from LSI's Accounting Department to Spinnaker which included as an attachment LSI's invoice 5595 and Account Purchase Form 9541 concerning invoice 5595.

(11) August 12, 2014, Larry Allen PAGE signed Account Purchase Form 9541 for Spinnaker to purchase from LSI an accounts receivable, that is, invoice 5595 for $57,800.

(12) August 12, 2014, LSI's Vice President for the Middle East caused Eagle Eye invoice 5595 addressed to Company B for a payment of $68,000 for services allegedly performed to be held and not mailed to Company B.

(13) August 29, 2014, Larry Allen PAGE sent an email to Spinnaker with attachments concerning the requested purchase of LSI invoice 5655 in the amount of $175,337.

(14) November 10, 2014, Larry Allen PAGE sent an email to John Andrew ELSNER explaining "how much of our borrowing capacity is tied up with financing invoices. I am defining any invoice not sent out to clients as a financing invoice."

(15) December 4, 2014, Larry Allen PAGE sent an email to Spinnaker attaching LSI's request that Spinnaker purchase LSI invoice 5968 which purported to have a face value of $175,337.

(16) March 23, 2015, Larry Allen PAGE caused an email to be sent to the private firm attempting to obtain funds for LSI from an investor, in which he explained LSI's Accounts Receivable as both secured and non-secured.

(17) March 27, 2015, Larry Allen PAGE forwarded an email from

Spinnaker to LSI's Vice President over Operations in which Spinnaker identified $1,227,359 in invoices that were outstanding payment for over 117 days all for the same invoice amount. PAGE informed the Office Manager in the email that Spinnaker "has become focused on this amount. May be an end to pre-factoring them".

(18) March 27, 2015, John Andrew ELSNER sent an email to Spinnaker with an explanation for the repetitive invoice amounts.

(19) March 27, 2015, John Andrew ELSNER forwarded an email from Spinnaker regarding a total of $4,327,855 outstanding in overdue payments on invoices in the same repetitive amount to LSI's Vice President for the Middle East.

(20) March 27, 2015, LSI's Vice President for the Middle East sent an email reply to John Andrew ELSNER regarding Spinnaker's observations in which she stated "Uh-oh".

All in violation of Title 18, United States Code, Section 1349.

### COUNTS TWO THROUGH EIGHT
### (Wire Fraud-Title 18, U.S.C. §1343)

A.    The Grand Jury re-alleges and incorporates by reference, as though fully set forth herein, the allegations contained in sections A, B, D and E as set out in Count One of the indictment.

B. On or about the following dates in the Southern District of Texas and elsewhere,

JOHN ANDREW ELSNER
LARRY ALLEN PAGE

the defendants, did knowingly devise and intend to devise a scheme to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme to defraud, and to obtain money by means of false and fraudulent pretenses, representations and promises did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce the following writings, signals, and sounds:

| COUNT | DATE | WIRE COMMUNICATION | INVOICE PURCHASED |
|---|---|---|---|
| 2 | 4/28/2014 | Wire transfer of $97,074.39 from Spinnaker to LSI | 5335 for $57,800 |
| 3 | 6/3/2014 | Wire transfer of $61,453.45 from Spinnaker to LSI | 5457 for $57,800 |
| 4 | 8/12/2014 | Wire transfer of $78,098.04 from Spinnaker to LSI | 5595 for $57,800 |
| 5 | 8/29/2014 | Wire transfer of $270,039.04 from Spinnaker to LSI | 5655 for $149,036.45 |
| 6 | 12/4/2014 | Wire transfer of $217,717.45 from Spinnaker to LSI | 5968 for $149,036.45 |
| 7 | 12/16/2014 | Wire transfer of $226,003.97 from Spinnaker to LSI | 5994 for $57,800 |
| 8 | 3/27/2015 | Wire transfer of $151,512.78 from Spinnaker to LSI | 6323 for $149,036.45 |

All in Violation of Title 18, United States Code, Section 1343.

## COUNT NINE
## (Conspiracy - Title 18, U.S.C. §1956(h))

A.  The Grand Jury re-alleges and incorporates by reference, as though fully set forth herein, the allegations contained in sections A, B, D and E as set out in Count One of the indictment.

B.  From in or about April 1, 2011 and continuing through June 15, 2015, in the Southern District of Texas, and elsewhere, and within the jurisdiction of this Court, the defendants,

JOHN ANDREW ELSNER
LARRY ALLEN PAGE

did unlawfully, knowingly and intentionally combine, conspire, confederate and agree with each other, to commit the following offenses against the United States in violation of Title 18, United States Code, Sections 1957, to wit:

To knowingly engage in and attempt to engage in monetary transactions within the United States in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

## NOTICE OF FORFEITURE
## 28 U.S.C. §2461(c); 18 U.S.C. §981(a)(1)(C)

Pursuant to Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to defendants

JOHN ANDREW ELSNER
LARRY ALLEN PAGE

that upon conviction for any of Counts One through Eight, all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses, is subject to forfeiture.

## NOTICE OF FORFEITURE

### 18 U.S.C. §982(a)(1)

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to defendants

JOHN ANDREW ELSNER
LARRY ALLEN PAGE

that upon conviction of conspiracy in violation of Title 18, United States Code, Section 1956(h) as charged in Count Nine, all property, real or personal, involved in such conspiracy or traceable to such property, is subject to forfeiture.

### Property Subject to Forfeiture

The property subject to forfeiture includes, but is not limited to, approximately $4,000,000.00.

### Money Judgment and Substitute Assets

Defendants are notified that upon conviction, a money judgment may be imposed against each defendant.

In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each defendant up to the amount of that defendant's money judgment.

A TRUE BILL:

ORIGINAL SIGNATURE ON FILE

FOREPERSON OF THE GRAND JURY

RYAN K. PATRICK
UNITED STATES ATTORNEY

By: Melissa J. Annis
Assistant United States Attorney